**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

<u>Jane C. Avery</u>

        v.                                    Civil No. 09-cv-265-JD

<u>Robert W. Hughes</u>

<u>ORDER</u>

        In this diversity action, plaintiff, Jane C. Avery, has
petitioned the court to attach real estate and other assets of
defendant, Robert W. Hughes, equal to $450,000.00, to secure
payment of an anticipated, favorable judgment on her claims under
New Hampshire law that Hughes breached a purchase and sale
agreement and a lease for property on Lake Winnipesaukee in
Wolfeboro, New Hampshire.  The parties appeared at an evidentiary
hearing on the prejudgment attachment petition on December 23,
2009.  For the reasons set forth below, Avery's petition (doc.
no. 9) is granted in part and denied in part.

<u>Background</u>

        Avery lives in Maine.  Her mother, Elvira Z. Avery, owned
property on Lake Winnipesaukee in Wolfeboro, New Hampshire,
consisting of a 3-bedroom home built in 1985 on a lot with 173
feet of frontage on the lake, a long deck, two docks, and
extraordinary views.  The property is adjacent to Brewster

Academy and a short walk to the Wolfeboro downtown.  Avery was a co-executor of her mother's estate ("Estate") and sole heir to the Wolfeboro property.  After Avery's mother died in April 2006, the property was appraised at $1.75 million.

Hughes is the sole owner of Prudential Spencer-Hughes Real Estate ("Prudential"), a Wolfeboro real estate brokerage firm that listed the property for sale during the relevant time period.  In March 2007, the Estate and Hughes entered into a purchase and sale agreement for the property, with a sales price of $1.6 million, a deposit of $25,000.00, and a closing on or before November 30, 2007.  See Pl.'s Ex. 1.  The parties agreed that $325,000 would be paid at the closing, and a note and a mortgage from Hughes to the Estate would cover the remainder, $1.25 million, with interest due for three years and a balloon payment of principal within three years of the closing.  Hughes negotiated and signed the agreement on his own behalf, while the co-executors, Avery and an attorney, signed for the Estate.

At the same time, Hughes and the Estate signed a lease for the property (Pl.'s Ex. 2), requiring him to pay $3,000 per month plus utilities and to post a $1,500 security deposit.  The lease term was set to begin March 15, 2007 and to end on either (a) the

2

closing (originally scheduled for November 2007); or (b) after either party provided 30 days' notice of an intent to terminate the lease, if the purchase and sale agreement was cancelled without a closing.

After the parties executed the agreements, Hughes paid $25,000 to the Estate by personal check, dated April 12, 2007. The check, which was never held in escrow, was deposited into the Estate's account in May 2007.  Hughes moved into the house and paid rent and utilities until late 2007, then stopped paying while continuing to live there for a period of time until he vacated in early 2008.

In November 2007, at the Estate's request to provide time for the Internal Revenue Service to issue a Federal Tax Lien Discharge, the parties agreed to delay the closing until February 29, 2008.  In January 2008, the Estate notified Hughes that it was prepared to close.  Hughes responded that he did not have the cash for the downpayment, and he did not appear at the scheduled closing on February 29, 2008.  The Estate and Hughes failed to reach any new agreement on the sale, and, when Hughes notified the Estate on April 14, 2008 that he had vacated the property and expected the Estate to cancel the purchase and sale agreement the

next day, the Estate accepted Hughes' April 14 notice as
expressing an intent to terminate the lease, effective 30 days
thereafter.

After cancelling the purchase and sale agreement on April
15, 2008, the Estate signed a new listing agreement with
Prudential for the property.  On July 14, 2008, the Estate
received an offer of $1.1 million from new buyers, the Rogers.
After negotiations, the Estate entered into a purchase and sale
agreement with the Rogers for $1.2 million, and that sale closed
on August 1, 2008.

Avery subsequently obtained an assignment of the Estate's
claims against Hughes and filed her complaint (doc. no. 1) in
this court.  Avery has claimed damages consisting primarily of
the difference between Hughes' $1.6 million purchase and sale
agreement and the $1.2 million sale price to the Rogers, with
certain adjustments, along with approximately $43,000.00 in
damages for Hughes' breach of the lease, including attorney fees.
See Pl.'s Mem. of L. in Supp. of Pl.'s Pet. to Attach with Not.,
at 7-8.

In his Answer (doc. no. 8), Hughes has asserted a number of
defenses to Avery's claims regarding the lease and the purchase

4

and sale agreement, including, among other things, estoppel,

laches, and accord and satisfaction.  Hughes admits that he

defaulted on the purchase and sale agreement, but maintains that

Avery elected the remedy of liquidated damages by retaining the

$25,000.00 deposit, and that this election bars her from seeking

actual damages.  <u>See</u> Ans. (doc. no. 8) ¶ 19; <u>see also</u> Def.'s

Reqs. for Findings of Fact & Rulings of Law (doc. no. 17), ¶¶ 16-

17 & 38.

<u>Discussion</u>

I.   <u>Standard of Review for Prejudgment Attachments</u>

Pre-judgment attachments are available to secure

satisfaction of judgments "under the circumstances and in the

manner provided by the law of the state where the district court

is held."  Fed. R. Civ. P. 64.  Under New Hampshire law, pre-

judgment attachments generally may only be issued after notice

and an opportunity to be heard have been given to the defendant.

<u>See</u> N.H. Rev. Stat. Ann. ("RSA") §§ 511-A:1 & -A:2.

At the hearing,

> the burden shall be upon the plaintiff to
> show that there is a reasonable likelihood
> that the plaintiff will recover judgment . . .
> on any amount equal to or greater than the
> amount of the attachment.  Upon satisfying
> said burden, the plaintiff shall be entitled

5

> to the attachment unless the defendant establishes
> to the satisfaction of the court that his assets
> will be sufficient to satisfy such judgment . . . .

RSA § 511-A:3.  The plaintiff's burden of proof to justify an

attachment is greater than the preponderance of evidence required

to prevail in a civil action.  See Chi Shun Hua Steel Co. v.

Crest Tankers, Inc., 708 F. Supp. 18, 25 (D.N.H. 1989) (citing

Diane Holly Corp. v. Bruno & Stillman Yacht Co., 559 F. Supp.

559, 561 (D.N.H. 1983)).  "[M]ore than a favorable chance of

success must be shown."  Diane Holly Corp., 559 F. Supp. at 561.

Plaintiff "must make a strong preliminary showing that he or she

will ultimately prevail on the merits and obtain judgment in the

requested amount."  Id.  Thereafter, the burden shifts to the

defendant to demonstrate it has the ability to satisfy the

potential judgment against it.  See RSA § 511-A:3.

II.   Plaintiff's Likelihood of Success

        Under New Hampshire law, which governs in this diversity

action, see Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217

F.3d 8, 10 (1st Cir. 2000), a "'breach of contract occurs when

there is a failure without legal excuse, to perform any promise

which forms the whole or part of a contract.'"  Poland v. Twomey,

156 N.H. 412, 415, 937 A.2d 934, 937 (2007) (citation omitted).

The goal of damages in actions for breach of contract "is to put the non-breaching party in the same position it would have been in if the contract had been fully performed." <u>Robert E. Tardiff, Inc. v. Twin Oaks Realty Trust</u>, 130 N.H. 673, 677, 546 A.2d 1062, 1064 (1988) (citation and internal quotation marks omitted).

    A.   <u>Purchase and Sale Agreement</u>

It is undisputed that Hughes breached the purchase and sale agreement by failing to close as agreed. The issue is whether Avery has made the requisite showing that she will prevail in the amount of damages that she has requested. This dispute centers on whether the agreement contained a valid liquidated damages clause, and whether Avery elected the exclusive remedy of liquidated damages when she retained the $25,000 deposit.

    1.   <u>Liquidated Damages and Nonrefundable Deposit</u>

The parties used the New Hampshire Association of Realtors Standard Form for their purchase and sale agreement. <u>See</u> Pl.'s Ex. 1. Most terms are preprinted, with specific amounts or conditions typed into blank spaces on the form. Paragraph 3 provides, in part, that a $25,000 deposit, in the form of a personal check from Hughes to the Estate, would be held in an escrow account by Prudential as escrow agent. Paragraph 14,

entitled "LIQUIDATED DAMAGES," contains the following preprinted terms:  "If BUYER shall default in the performance of their [sic] obligation under this Agreement, the amount of the deposit may, at the option of SELLER, become the property of SELLER as reasonable liquidated damages. . . ."  Pl.'s Ex. 1.

Paragraph 17 contains two typed-in paragraphs.  The first made Hughes' offer contingent on owner financing and upon Hughes being able to lease the property until closing at a rate of $3,000 per month plus utilities and maintenance.  The second provides, as follows:  "Should the seller accept the terms and conditions of the sale including the owner financing contingency, the buyer's deposit becomes non-refundable and will be released to the seller prior to the buyer moving into the home, or March 15, 2007, whichever comes first."  Pl.'s Ex. 1.

After the parties executed both agreements, Hughes paid the $25,000 deposit using a personal check drawn from his own account.  Hughes did not place the check into an escrow account.  Rather, he paid it to the Estate, and the Estate deposited it into its own account in May 2007.  This transaction occurred more than six months before the breach occurred.

In Orr v. Goodwin, 157 N.H. 511, 953 A.2d 1190 (2008), the

New Hampshire Supreme Court upheld the validity of a liquidated damages clause with terms substantially the same as those at issue in Paragraph 14.  See id. at 518-19, 953 A.2d at 1197. Avery contends, however, that Paragraph 17, making the deposit nonrefundable, rendered the liquidated damages clause here a nullity.  As explained below, Paragraphs 14 and 17 are complementary terms, when construed in light of pertinent cases and other circumstances.

"When interpreting a written agreement," the court should "give the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole." Id. at 514, 953 A.2d at 1193.  Here, the pertinent circumstances include both parties' sophistication and familiarity with real estate law.  The Estate engaged counsel to assist it in the negotiations, and one of the co-executors was an attorney. Hughes was an experienced real estate broker, involved in real estate transactions since 1988.  Hughes testified that he was familiar with the terms in the standard contract, and that he provided the language used in Paragraph 17.  Both parties reviewed the terms at issue and initialed each page of the

contract.

The pertinent circumstances also include the real estate market in which the parties negotiated.  Hughes testified that at the time of contracting, the market was slowing down, but that he and others in the industry did not think that the bottom was about to drop out of the market.

These sophisticated parties' use of terms in the agreement should be construed in light of similar terms at issue in pertinent cases in New Hampshire.  In C&M Realty Trust v. Wiedenkeller, 133 N.H. 470, 476-77, 578 A.2d 354, 357-58 (1990), the parties entered into a purchase and sale agreement including a liquidated damages provision, requiring the buyer to pay an initial $25,000 deposit, which the seller could retain as liquidated damages.  The parties also agreed to requiring the buyer to pay an additional "nonrefundable deposit" of $100,000. The seller demanded that the additional deposit be made in the form of a check payable to him and not placed in escrow.  The buyer breached by failing to close at the time specified and sued to recover the $100,000 deposit after the seller resold the property for $35,000 more than the price in the breached contract.  The court in C&M treated the liquidated damages term

10

and the "nonrefundable" deposit term as complementary, concluding that the $100,000 deposit was intended to be part of the funds subject to retention by the seller as liquidated damages if the buyer breached.  See id.

Similarly, in this case, the terms at issue in Paragraphs 14 and 17 are complementary; consistent with C&M, Paragraph 17's reference to a "nonrefundable" deposit emphasizes what Paragraph 14 states regarding the seller's option of electing the remedy of liquidated damages for a breach.  Even if the property were later sold at a higher price, as occurred in C&M, Hughes could not demand remittance of the deposit following his breach if the seller elected the remedy of liquidated damages.

> 2.   Election of Remedies

Paragraph 17 specifies that the seller has the "option" of retaining the deposit as liquidated damages.  Whether Avery elected the remedy of liquidated damages is the next issue. Hughes had the burden of proving that the Estate had already elected liquidated damages, and that Avery was estopped from asserting a claim for actual damages.  Cf. Great Lakes Aircraft Co. v. City of Claremont, 135 N.H. 270, 289, 608 A.2d 840, 853 (1992) ("party invoking estoppel has the burden of proving that

its application is warranted"); 12 Arthur Corbin, <u>Corbin on Contracts</u> § 1220, at 495 (Interim ed. 2002) (estoppel principles provide rationale for limiting injured party's right to change his or her election of remedies for breach of contract); <u>cf. also Orr</u>, 157 N.H. at 518-19, 953 A.2d at 1197 (seller with choice of remedies under purchase and sales agreement was bound by initial choice of liquidated damages because allowing seller to shift remedies would be unjust).

The evidence before me on the election of remedies distinguishes this case from <u>Orr</u>, in which the retention of a deposit for more than a year, among other things, led the court to conclude that the seller had elected the liquidated damages remedy.  Here, Paragraph 17 and Hughes' conduct gave the Estate a right to claim the deposit as her property <u>before</u> the breach occurred.  Hughes paid the deposit by check to the Estate prior to the breach without ever placing the funds in escrow, a practice that he testified was atypical for real estate transactions.  No similar facts were operative in <u>Orr</u>, where, presumably, the deposit had been placed in escrow, and the funds were released to the sellers after the breach in accordance with RSA § 331-A:13 (regarding broker's duty to maintain escrow

accounts for deposits on executed purchase and sale contracts).

Furthermore, in <u>Orr</u>, no contact occurred between the parties prior to the sellers filing suit almost eighteen months after they claimed the deposit. The facts are different here. In her declaration, Avery stated, "On April 30, May 27, and June 19 of 2008, the Estate advised Hughes that the Property was being actively marketed, and that the Estate intended to accept the first serious offer from a new buyer, which would fix Hughes' liability for loss of value damages at the difference between $1,600,000 and the price of the sale to a new buyer." Hughes in his Answer denied the allegations in the Complaint that repeat this part of the Declaration.[1] Hughes provided no evidence or testimony to challenge what I infer to be the meaning of Avery's statement: the Estate told Hughes in 2008 that it considered him

---

[1]In the Answer, which is not verified by any affidavit or declaration, Hughes states, in pertinent part:

> Hughes . . . admits that the Estate communicated to Hughes, through counsel, on April 30, May 27, and June 19, 2008, regarding the marketing of the Property and the Estate's opinion regarding Hughes' liability, but does not recall being advised that the Estate intended to accept the first serious offer from a new buyer. To the extent a further response is required, Hughes denies the remaining allegations contained in Paragraph 22 of the Complaint.

Ans. ¶ 22 (doc. no. 8).

liable for loss of value damages.  While it is true that hearings on petitions for prejudgment attachment are not subject to rules of evidence, Hughes, having the burden of proof on the election of remedies, failed to offer testimony or any other evidence at the hearing to dispel the implication of Avery's declaration on this issue.  I conclude that Hughes did not carry his burden of showing at this stage of the case that Avery is barred from pursuing a claim for actual damages.

### 3.   Amount of Damages for Failure to Close

The last issue, as to the purchase and sale agreement, is whether Avery carried her burden of proving the amount of damages.  See RSA § 511-A:3.  "[I]n a land sale contract the proper measure of damages is the seller's loss of bargain; that is, the difference between the contract price and the actual value of the real estate at the time of the breach."  Orr, 157 N.H. at 516, 953 A.2d at 1195.  In addition, "damages may be recovered for those harms that are reasonably foreseeable at the time the parties entered into the contract."  Id.; see also Tardiff, 130 N.H. at 677, 546 A.2d at 1064 ("consequential damages that could have been reasonably anticipated by the parties as likely to be caused by the defendant's breach are

properly awarded to the non-breaching party in a contract action"
(citation and internal quotation marks omitted)).

Avery claimed damages exceeding $373,000.00 at the time of
the attachment hearing, consisting primarily of the difference
between Hughes' $1.6 million purchase and sale agreement and the
$1.2 million sale price to the Rogers, with offsets for avoided
costs and a credit for the $25,000 deposit.  <u>See</u> Pl.'s Mem. of L.
in Supp. of Pl.'s Pet. to Attach with Not., at 7-8.  Her claim is
summarized and itemized in Plaintiff's Exhibit 6, which I have
received for the purpose of aiding the trier of fact.

The evidence on the value of the property at the time of the
breach included testimony that offers for $1.2 million had been
received prior to March 2007.  Hughes' firm actively marketed the
property for sale after his breach and ultimately sold it for
$1.2 million six months after the breach.  Accordingly, Avery
carried her burden of proving the largest component of her
damages for the purposes of obtaining a prejudgment attachment.

As to any consequential damages, the evidence included costs
incurred to pay utility bills, insurance premiums, property tax
bills, and interest on a home equity line of credit.  In
addition, Avery testified that she incurred certain costs for

15

grounds maintenance.  Avery has carried her burden of proving
that these costs were reasonably foreseeable at the time of
contracting, and that they were incurred in the amounts alleged.
See Tardiff, 130 N.H. at 677, 546 A.2d at 1064 (carrying costs
including taxes, insurance premiums, interest, and utility bills
are recoverable upon buyer's breach).

Avery has also claimed "staging costs" of $7,000 that she
spent to make the property more marketable to buyers in May 2008.
She testified that these costs included repainting, removing
wallpaper, replacing outdoor furniture, putting in a kitchen
banquette, and replacing countertops.  The evidence showed,
however, that the house's location and views, not its furnishings
and wallcoverings, made the property valuable and marketable.
Avery's testimony that she would not have had to make these
investments if Hughes had not breached does not prove that these
costs were reasonably foreseeable at the time of contracting.
Accordingly, in light of all the evidence before me, I find that
Avery has not carried her burden of proof as to the staging
costs.

The amount of damages awarded must be reduced by the amount
of any credits received from the buyer and by certain expenses

16

avoided because of the breach.  <u>See John A. Cookson Co. v. N.H.
Ball Bearings, Inc.</u>, 147 N.H. 352, 359, 787 A.2d 858, 865 (2001)
("if a defendant's breach of contract saves expense to the
plaintiff, the plaintiff's total damages will be reduced by the
amount of money saved").  Here, Avery has provided an itemized
statement of these credits and offsets amounting to $49,425.
Hughes has not disputed any of these figures.  Accordingly, Avery
has carried her burden of proving a reasonable likelihood of
prevailing on her claim for Hughes' breach of the purchase and
sale agreement in an amount, excluding staging costs, equal to
$366,790.72, as summarized in Plaintiff's Exhibit 6.

    B.   <u>Lease</u>

    The lease agreement required Hughes to pay rent and
utilities for the term of the lease.  The lease term began in
March 2007 and was set to terminate at the closing originally
scheduled for November 2007, or, if the closing failed to occur
and the purchase and sale agreement were cancelled, thirty days
after either party provided the other with a notice of
termination of the lease.  <u>See</u> Pl.'s Ex. 2.

    Hughes admitted in his Answer and on the witness stand that
he occupied the property for a period of time without paying rent

and testified that he had been notified that certain utility
bills were due.  <u>See</u> Ans. (doc. no. 8), ¶ 16.  At the hearing,
Hughes testified that he had sent emails to the Estate and Avery
acknowledging that he had an obligation to make up for unpaid
rent and utilities.  While Hughes claimed to have had
correspondence with the Estate regarding his ability to stay on
rent-free, Avery denied ever agreeing to any modification of the
lease, and no writing was introduced to support Hughes' claim.
Accordingly, I find that Avery has carried her burden of proof
under RSA § 511-A:3, regarding Hughes' liability for breaching
the lease agreement.

The lease required the tenant to pay late charges on overdue
rents and permitted the landlord to deduct unpaid rent from the
security deposit.  Hughes would be responsible for "all costs,
charges, and expenses, including attorneys' fees," if the
"Landlord seeks legal advice or assistance to enforce any breach
of the Lease."  Pl.'s Ex. 2, at 5.

Avery offered an itemized list of her damages for the breach
of the lease, including rent (12/1/07-5/14/08), electricity
(11/1/07 -5/14/08), and water and sewer (9/4/07-5/14/08).  The
amount claimed is offset by the amount of Hughes' security

deposit.  These items were payable under the lease, and Avery

showed that Hughes failed to pay them.

In addition, Avery has claimed late charges on unpaid rent

assessed at five percent through the term of the lease, amounting

to almost $820.00.  Late charges were made payable under the

lease.  Such charges may be recoverable if they are not deemed to

be a penalty.  See 11 Joseph M. Perillo, Corbin on Contracts

§ 58.8 (rev. ed. 2005).  Hughes has not contested his

responsibility for paying these charges as damages.  Accordingly,

Avery has carried her burden of showing that she is entitled to

certain late charges as part of her damages.

The lion's share of Avery's claim for damages from the

breach of the lease agreement is her claim for more than $24,000

in legal fees.  Such fees may be recoverable if the court is

satisfied that they are reasonable.  See Tulley v. Sheldon, 159

N.H. 269, 273, 982 A.2d 954, 957 (2009); 11 Joseph M. Perillo,

Corbin on Contracts § 58.8 (rev. ed. 2005); Restatement (Second)

of Contracts § 356 cmt. d, at 160 (1981).  The lease agreement

specifically grants the Estate a right to recover legal fees that

may be incurred to enforce the lease or to pursue a successful

collection action.  In this case, however, Avery provided no

evidence whatsoever to show that the fees were reasonable.  She undoubtedly has incurred fees for services provided by the same attorneys for matters other than collecting unpaid rent, including, for example, litigation over the purchase and sale agreement.  Given that plaintiff's burden in a prejudgment attachment hearing is greater than a mere preponderance of the evidence, I find the evidence as to the legal fees insufficient at this time to warrant a prejudgment attachment.  Therefore, Avery has carried her burden for the purposes of obtaining a prejudgment attachment as to the breach of the lease in the amount of $18,918.50 only.

III.   Hughes' Ability to Satisfy a Judgment

To avoid an attachment, Hughes had the burden of showing that he has the ability to pay a money judgment.  The evidence showed that Hughes held several properties for investment purposes in 2008, suffered cash flow problems in 2007 and 2008, but earned a commission on at least one sale since the breach.  I cannot infer an ability to pay any part of the requested attachment from this evidence.  Hughes has accordingly failed to carry his burden of proof for the purposes of defeating the petition to attach.

20

<u>Conclusion</u>

For the reasons set forth above, the petition to attach in the amount of $450,000.00 should be granted in part and denied in part.  Plaintiff has made the strong showing necessary to establish that she is likely to prevail on her claim for damages under the purchase and sale agreement in the amount of $366,790.72 (excluding staging costs), and for damages under the lease, in an amount equal to $18,918.50 (excluding attorney fees).  Accordingly, an attachment in the amount of $385,709.22 shall issue against Hughes.

**SO ORDERED.**

James R. Muirhead
United States Magistrate Judge

Date:  January 20, 2010

cc:  William C. Saturley, Esq.
     Laurie R. Bishop, Esq.
     Timothy A. Gudas, Esq.

JRM:nmd

21