UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Jane C. Avery


        v.                          Civil No. 09-cv-265-JD
                                    Opinion No. 2010 DNH 147

Robert W. Hughes


O R D E R

     Jane Avery sued Robert Hughes, alleging that he breached a
lease agreement and a real estate purchase and sale agreement.
Avery now moves, under Federal Rule of Civil Procedure 56(d)(1)
and (2), for partial summary judgment.  Hughes objects.


Background

     On March 26, 2007, Avery, as co-executor of her mother's
estate ("Estate"), entered into a purchase and sale agreement
("Agreement") with Hughes for real property in Wolfeboro, New
Hampshire.[1]  The total price was $1.6 million, which included a
"deposit" of $25,000, to be paid by personal check and held in an
escrow account.  Pl.'s Memo., Avery Decl., Exh. A (Agreement).

_____

     [1]Hughes signed the purchase and sale agreement in his
personal capacity.  He is also the sole owner of Prudential
Spencer-Hughes, the real estate brokerage firm that marketed the
property.

In addition to the Agreement, Hughes and the Estate's executors entered into a lease agreement ("Lease"), dated March 14, 2007, for the same Wolfeboro property.  Pl.'s Memo., Avery Decl., Exh. B (Lease).

Paragraph 3 of the Agreement provided that "DEPOSIT . . . is to be held in an escrow account by Prudential Spencer-Hughes ("ESCROW AGENT"), in the sum of $25,000.00.  ADDITIONAL DEPOSIT will be paid on or before[:] see addendum."  Agreement at 1. Paragraph 14 of the Agreement, entitled "LIQUIDATED DAMAGES," stated that, "[i]f BUYER shall default in the performance of [his] obligation under this Agreement, the amount of the deposit may, at the option of SELLER, become the property of SELLER as reasonable liquidated damages."  Id. at 3. Paragraph 17, "ADDITIONAL PROVISIONS," stated

> This agreement is contingent upon the owner financing
> listed in the financing contingency addendum. . . .
> Should the seller accept the terms and conditions of
> the sale including the owner financing contingency, the
> buyer's deposit becomes non-refundable and will be
> released to the seller prior to the buyer moving into
> the home, or March 15th 2007, whichever comes first.

Id. at 5.  The Agreement originally required a closing date of November 30, 2007, but Hughes and the Estate's executors signed an amendment that rescheduled the closing for February 29, 2008. Pl.'s Memo., Avery Decl., Exh. C.

The Lease required Hughes to pay the Estate $3,000 a month in rent, and rent not paid by the 10th of each month would be subject to a five percent late fee.  Lease at 1.  The Lease stated that Hughes had given the Estate $1,500 as a security deposit.  It also required Hughes to reimburse the Estate, "within ten days of receiving a copy of the applicable bill, for all utilities, including but not limited to heat, hot water, water and sewer charges, and electricity."  Id. at 2.  According to its terms, the Lease terminated on the earlier of two occurrences: a) the parties fulfill their obligations under the Agreement, and Hughes closes on the property, or b) the Agreement terminates without a closing, and either party gives the other a 30-day notice of termination of the Lease.  Id. at 1.

Hughes occupied the property and paid the rent and utilities due under the Lease for several months.  He also gave a personal check for $25,000, dated April 12, 2007, directly to the Estate, which the Estate deposited in May, 2007.  In late 2007, Hughes stopped paying rent and utilities, and he failed to complete the closing on February 29, 2008.  At some point before March 21, 2008, the Estate offered to extend the closing again and to make other accommodations to enable Hughes to continue to live on the property.  See Pl.'s Memo., Avery Decl. at 4; Deft.'s Memo., Hughes Aff. at 2.

3

On March 21, the Estate's attorney emailed Hughes, acknowledging a previous email from Hughes to Avery stating that Hughes did not "see any chance of being able to close under the modified terms of [the Estate's] last offer, which included a closing deadline extended to May 15, and a down payment reduced to $150,000."  Deft.'s Memo., Hughes Aff., Exh. A at 1.  In the email, the attorney and the Estate

> propose that [Hughes] sign an agreement with [Avery] that terminates the [purchase and sale agreement] on account of your breach, forfeits the deposit, liquidates the damages for the property's current loss in value at a fair amount (we previously proposed $500,000), makes you liable for Jane's out-of-pocket costs (mainly legal fees) to date and going forward, and for rent and utilities as long as you occupy the property, as well as damages resulting in any way from your occupancy, and provides for interest at a variable market rate.

Id. at 1-2.  The email continued:  "The agreement would provide that all amounts due are payable immediately, but [Avery] has indicated that she would not be asking us to press you for immediate payment."  Id. at 2.  The attorney also conveyed that Avery "thinks it would be reasonable for you to continue to live at the property until May 15 without further payment of rent or utilities, provided you keep your use of utilities to a minimum, and that you plan to move out on May 15."  Id.  The final paragraph concluded, "[W]e believe this is the best way to do it.

Please let me know if this is acceptable to you in principle, and I can prepare a form of agreement for your review." Id.

On April 14, 2008, Hughes's attorney notified the Estate's attorney that Hughes had vacated the property, and the Estate's attorney responded that "we will take your notification today of [Hughes]'s move as a 30-day notice of termination, which means the lease will terminate on May 14." Pl.'s Memo., Barney Decl., Exh. A. In the same correspondence, the Estate's attorney explained that, pursuant to Paragraph 14 of the Agreement, "Seller has the 'option' to claim the Buyer's deposit as reasonable liquidated damages. Seller is choosing not to exercise this option." Id. On April 15, 2008, the Estate signed a new listing agreement with Prudential Spencer-Hughes, and the property was returned to the market. The Estate eventually sold the property for $1.2 million in August, 2008.

The Estate assigned its claims against Hughes to Avery, who sued Hughes, claiming damages arising out of the breach of both the Agreement and the Lease. The bulk of the damages Avery claims is the difference between the $1.6 million price in the Agreement and the $1.2 million price at which the property was ultimately sold. The amount Avery seeks as actual damages is offset by, inter alia, the $25,000 deposit.

Avery sought to attach $450,000 of Hughes's real and other property.  An evidentiary hearing was held on the petition to attach, after which the magistrate judge issued an order approving the attachment in the amount of $385,709.22.  See doc. nos. 20 (order), 28 (transcript of evidentiary hearing).  Hughes objected to the magistrate judge's order, but this court approved it.  See doc. no. 24.

## Standard of Review

"A party claiming relief may move . . . for summary judgment on all or part of the claim."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A party opposing a properly supported motion for summary judgment must present competent evidence of record that shows a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  All reasonable inferences and all credibility issues are resolved in favor of the nonmoving party.  See id. at 255.

6

<u>Discussion</u>

In Count I, Avery alleges that, beginning in late 2007, Hughes failed to make payments required under the Lease, including rent and utilities.  In Count II, she alleges that Hughes breached the Agreement by failing to close on the appointed date, and that consequently he is liable for her damages, including the loss in value of the property.  With respect to Count I, Avery seeks summary judgment as to liability and as to some, but not all, of her damages.  With respect to Count II, Avery seeks summary judgment that Hughes breached the Agreement and that her damages are not limited to Hughes's $25,000 deposit.

"When interpreting a written agreement, [a court must] give the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole." <u>In re Taber-McCarthy</u>, 160 N.H. 112, 115 (2010) (citing <u>Czumak v. N.H. Div. of Dev. Servs.</u>, 155 N.H. 368, 373 (2007)).  "Absent ambiguity, the parties' intent will be determined from the plain meaning of the language used in the contract."  <u>Id.</u>  "'The language of a contract is ambiguous if the parties to the contract could reasonably disagree as to the meaning of that

7

language.'"   Id. (quoting N.A.P.P. Realty Trust v. CC Enters.,
147 N.H. 137, 139 (2001)).

A.   Count I

    Avery contends that she is entitled to summary judgment
because the Estate and Hughes entered into the Lease, Hughes
failed to pay rent and utilities owed under the Lease, and
therefore Hughes is liable for breach of the Lease.  Avery also
argues that she is entitled to damages in the amount of
$18,918.50, which is comprised of unpaid rent for the period from
December 1, 2007, to May 14, 2008; late fees of $817.74; and
electricity and water/sewer utilities of $2,901.06 and $344.86,
respectively.

    In his objection, Hughes contends that a material question
of fact exists regarding whether he breached the Lease.  He
argues that he was told that he could continue to live on the
property without paying rent or utilities.  Hughes also argues
that Avery has not shown that Hughes received copies of each of
the utility bills, as required under the terms of the Lease, and
that sometimes he was merely informed, by email, of the amount of
the utility bill, without receiving a copy of the bill.  Hughes
admits, however, that "there are at least some rent and utility
payments that are legitimately due." Deft.'s Obj. at 9.

8

In her reply, Avery argues that the email suggesting that
Hughes might stay without paying rent or utilities was merely an
offer, as evidenced by the conditional language of the email.
Because Hughes never accepted the offer, Avery contends, Hughes
never actually had permission to live there without payment, as
he suggests.

1.   <u>Breach</u>

Under New Hampshire law, "'[a] breach of contract occurs
when there is a failure without legal excuse to perform any
promise which forms the whole or part of a contract.'"  <u>Lassonde
v. Stanton</u>, 157 N.H. 582, 588 (2008) (quoting <u>Poland v. Twomey</u>,
156 N.H. 412, 415 (2007)) (alteration omitted).  Hughes failed to
pay at least some of the rent and utilities due under the Lease,
and he admits that fact.  <u>See</u> Pl.'s Memo., Exh. 2 ("Hearing Tr.")
at 49-51, 65.  Although Hughes argues that he has a legal excuse,
or excuses, for not paying some of the rent and utilities that
Avery claims are due, he does not contend that he was excused
from paying all of what Avery claims.

Hughes appears to argue that the Lease was altered by a
subsequent contract.  "A valid, enforceable contract requires
offer, acceptance, and a meeting of the minds on all essential

3333333333333333333333333333333333333333terms."   <u>Glick v. Chocorua
Forestlands Ltd. P'ship</u>, 157 N.H. 240, 252 (2008) (citation
omitted).

Hughes submitted a copy of an email from the Estate's
attorney to him, dated March 21, 2008, in which the Estate
proposed a new contract.  The email explicitly stated, "we would
<u>propose</u> that [Hughes] sign an agreement with [Avery] that
terminates the [purchase and sale agreement] on account of your
breach, forfeits the deposit, liquidates the damages for the
property's current loss in value at a fair amount . . ., [and
makes Hughes liable for other amounts]."  Deft.'s Memo., Hughes
Aff., Exh. A at 1-2 (emphasis added).  Under the Estate's
proposal, Hughes would also have to sign mortgages and security
agreements to give Avery a security interest in his properties.
The email also proposed that "[t]he agreement <u>would</u> provide that
all amounts due are payable immediately," but that "it would be
reasonable for [Hughes] to continue to live at the property until
May 15 without further payment of rent or utilities, provided
[he] keep [his] use of utilities to a minimum, and that [he] plan
to move out on May 15."  <u>Id.</u> at 2 (emphasis added).  The
remainder of the paragraph is written entirely in conditional
language: "[Avery] would like you to continue to market the
property"; "We would consult with [Hughes] and [Avery] as to

[seasonal rentals]"; "[W]e would consult with [Hughes] and [Avery] as to what price and other terms made sense."  The email concluded:

> [W]e believe this is the best way to do it.  Please let me know if this is acceptable to you in principle, and I can prepare a form of agreement for your review. . . . I would also need to have documentation on your various property interests so as to prepare proper mortgages and/or security agreements and other security documents.

Id.

The language of the email makes it clear that it is, at most, an offer.  Hughes introduced no evidence that he accepted the offer.  Therefore, no new contract was formed.  Hughes has not raised a genuine issue of material fact as to whether the Lease remained in full effect.  Hughes breached the Lease and is liable for damages for the breach.

2.  Damages

Avery has introduced evidence that Hughes stopped paying rent and utilities in late 2007 and that he gave a thirty-day notice of cancelling the Lease on April 14, 2008.  Pl.'s Memo., Avery Decl. at 4-5.  At the evidentiary hearing, Avery submitted an accounting of the items for which she believed Hughes was liable.  Pl.'s Memo., Avery Decl., Exh. E.  According to the accounting, Hughes did not pay rent beginning December 1, 2007;

did not pay for electricity beginning November 1, 2007; and did not pay for water/sewer usage beginning September 4, 2007. Hughes does not dispute that he stopped paying rent and utilities on those dates, and he does not dispute Avery's calculations regarding amounts due for "the term [he] was in the property." Hearing Tr. at 51-52.  Because Hughes gave his 30-day notice of termination of the Lease on April 14, 2008, he is liable for rent and utilities up to May 14, 2008.  The Lease also provides that payments not made by the 10th of each month are subject to a five percent late charge, and Hughes is liable for this amount as well.

### a.   Rent & Late Charges

The evidence of record shows that Avery is entitled to payment of rent for December 1, 2007, through May 14, 2008, as well as late charges for those payments.  As Avery concedes, the amount due under the lease should be reduced by $1,500, the amount of Hughes's security deposit.  The rent and late charges due, therefore, total $15,672.58.

### b.   Utilities Bills

With respect to his liability for utilities, Hughes appears to argue that he need only pay after he receives a copy of the

12

applicable bill and that the evidence shows that he did not receive some of those bills.  Avery disputes that such a requirement exists.  In her reply, Avery also points out that each of the utility bills at issue was presented at the evidentiary hearing and attached to her summary judgment motion.

As discussed above, a court gives the language in a contract "its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole."  Taber-McCarthy, 160 N.H. at 115 (citing Czumak, 155 N.H. at 373).  "[I]n the absence of ambiguity, we determine the parties' intent from the plain meaning of the language used."  Sabinson v. Trustees of Dartmouth Coll., --- A.2d ----, 2010 WL 2595947, at *4 (June 30, 2010) (citation omitted).  "We assign the words and phrases used by the parties their common meaning, and ascertain the intended purpose of the contract based upon the meaning that a reasonable person would give to it."  Id.

The Lease provides that "[Hughes] shall reimburse [the Estate], within ten days of receiving a copy of the applicable bill, for all utilities, including but not limited to heat, hot water, water and sewer charges, and electricity."  Lease at 2. The plain meaning of the language is that Hughes must pay for all utilities, and that the payments are due within ten days of

13

receiving a copy of the bill.  Hughes argues that the clause
"within ten days of receiving a copy of the applicable bill"
imposes a condition precedent that he must receive a copy of each
bill before he becomes liable for any utility payment.  Hughes's
interpretation is not persuasive.  The intended purpose of the
paragraph entitled "Utilities" was that Hughes be responsible for
any utilities he used.  The plain, reasonable meaning of the
language is that it creates a deadline by which Hughes must
submit his reimbursements, not that it creates a limitation upon
his liability.

     Even if Hughes's interpretation were correct, Avery
submitted copies of the electricity and water/sewer bills at
issue during the December 23, 2009, evidentiary hearing.  See
Hearing Tr. at 26-27; Pl.'s Memo., Exh. 2, Exhs. 8(A)-8(I), 9(A)-
9(D).  More than ten days have passed since the hearing, and
therefore, even under Hughes's interpretation of the contract,
the reimbursements for utilities were due at least by January 2,
2010.

     As discussed above, Avery has introduced evidence that
Hughes stopped paying rent and utilities before December of 2007
and that he gave a thirty-day notice of cancelling the lease on
April 14, 2008.  Pl.'s Memo., Avery Decl. at 4-5.  Other than his
arguments discussed above, which are unavailing, Hughes does not

14

dispute that Avery's calculations of the amounts due for utilities are correct.  The evidence of record shows that Avery is entitled to payment of utilities totaling $3,245.92.

In sum, there is no genuine issue of material fact that precludes granting summary judgment in favor of Avery on the issue of liability for Count I.  Avery has shown that she is entitled to $18,918.50 in damages, which consists of unpaid rent, late charges, and utilities, less Hughes's security deposit.

B.    Count II

In Count II of her complaint, Avery alleges that Hughes breached the Agreement by failing to close on the agreed date. She seeks damages in excess of $373,000, the bulk of which consists of the difference between the selling price in the Agreement and the ultimate sale to a different buyer, less Hughes's $25,000 deposit.

In his objection, Hughes admits that he breached the Agreement and concedes that Avery is entitled to summary judgment with respect to liability for his breach.  See also Hearing Tr. at 49.  He argues, however, that his liability is limited to $25,000, under the terms of the Agreement.

Paragraph 3 of the Agreement states that "DEPOSIT, receipt of which is hereby acknowledged in the form of personal check, is

15

to be held in an escrow account by Prudential Spencer-Hughes ("ESCROW AGENT"), in the sum of $25,000.00.  ADDITIONAL DEPOSIT will be paid before[:] see addendum, in the sum of $_____."  Agreement at ¶ 3.  Paragraph 14, entitled "LIQUIDATED DAMAGES," provides that, "[i]f BUYER shall default in the performance of [his] obligation under this Agreement, the amount of the deposit may, at the option of SELLER, become the property of SELLER as reasonable liquidated damages."  Id. at ¶ 14.  Paragraph 17, in turn, states:  "Should the seller accept the terms and conditions of the sale including the owner financing contingency, the buyer's deposit becomes non-refundable and will be released to the seller prior to the buyer moving into the home, or March 15th 2007, whichever comes first."  Id. at ¶ 17.

Avery argues that the $25,000 deposit was not liquidated damages because the Agreement provided that the deposit was non-refundable consideration for a large amount of owner financing[2] and for Hughes' right to occupy the property immediately, pursuant to the Lease.  Avery contends that the deposit could not serve as liquidated damages because she was entitled to treat it

---

[2]The purchase and sale agreement provided that the Estate would finance $1,250,000 of the purchase price, with an interest rate of 6%.  Agreement at ¶ 16.  The repayment schedule required Hughes to pay "interest only for three years with a balloon payment due in three years from date of closing."  Id.

as non-refundable at least by March 15, 2007, long before Hughes breached the Agreement.  If the $25,000 were construed to be liquidated damages, she contends, she would not have a remedy for Hughes's breach.  Furthermore, Avery argues, neither she nor the Estate ever made an election to retain the deposit as liquidated damages.  Rather, her attorney told Hughes's attorney, in an April 14, 2008, email, that the Estate was choosing <u>not</u> to accept liquidated damages.

Hughes argues that paragraph 17 of the Agreement, the "Additional Provisions" is ambiguous, and that the court should look to the intent of the parties to determine its meaning.  He also contends that their intent cannot be determined on summary judgment.  In support of his argument, Hughes offers several pieces of evidence to show his intent and understanding regarding the deposit.  Hughes also argues that a genuine issue of material fact exists regarding whether the Estate accepted the $25,000 deposit as liquidated damages, because although the attorney rejected it in an April, 2008, email, the Estate accepted and retained the deposit in May, 2007, and thus elected to liquidate damages at that time.  In the alternative, Hughes argues that Avery is entitled only to the $25,000 as liquidated damages

17

because Hughes intended it to be so and he believed Avery did,
too.[3]

Avery replied to Hughes's objection, arguing that Hughes's
interpretation of the Agreement was inaccurate and that C&M
Realty Trust v. Wiedenkeller, 133 N.H. 470 (1990), did not
support his theory.  Avery contends that the language of the
Agreement is not ambiguous because, while Hughes's interpretation
differs, it is not reasonable.  Avery also points out that
Hughes's arguments rest to a great extent upon his subjective
state of mind rather than on an objective standard, as required
by New Hampshire law.

As discussed above, "'[t]he language of a contract is
ambiguous if the parties to the contract could reasonably
disagree as to the meaning of that language.'"  Taber-McCarthy,
160 N.H. at 115 (quoting N.A.P.P. Realty Trust, 147 N.H. at 139).
"Absent ambiguity, the parties' intent will be determined from
the plain meaning of the language used in the contract."  Taber-
McCarthy, 160 N.H. at 115.

---

[3]The court notes that the magistrate judge addressed the
issue of whether Hughes's liability was limited to the $25,000
deposit in his order allowing the attachment, which this court
subsequently approved.  See doc. no. 20 at 7-14.  The evidence
before the magistrate judge was substantially the same as the
evidence now before the court on summary judgment.  Although the
standard of review is different, the issues are largely legal
ones and, unsurprisingly, the outcome is the same.

a.   <u>Meaning of Paragraphs 14 and 17</u>

The evidence reveals that the circumstances in which the Agreement was negotiated were the following.  Hughes was the sole owner of a real estate brokerage firm, and he was familiar with real estate transaction documents, including purchase and sale agreements.  <u>See</u> Hearing Tr. at 55.  He was licensed as a broker in 1988.  <u>Id.</u> at 62.  Hughes drafted the portion of paragraph 17 that made the deposit non-refundable upon the earlier date of either his move into the property or March 15, 2007.  <u>Id.</u> at 61-62.  Prior to the transaction between the two parties, Avery had bought and sold her personal homes three times.  <u>Id.</u> at 40-41.  Each of the three transactions were done pursuant to purchase and sale agreements, but none of them contained liquidated damages clauses, and all three closed as planned.  <u>Id.</u>  The Estate's other co-executor was Charles Sheridan, an attorney.  <u>Id.</u> at 35.  At the time the parties entered into their Agreement, the real estate market "had slowed down a bit."  <u>Id.</u> at 70.

In <u>C&M Realty Trust</u>, the parties signed a purchase and sale agreement that required the buyer to pay a $25,000 deposit.  133 N.H. at 472.  The contract also contained a liquidated damages clause that allowed the seller, at his option, to retain the deposit in the event of the buyer's breach.  <u>Id.</u>  Because the buyer was unable to close on the original closing date due to

19

financing problems, the closing was postponed.  <u>Id.</u>  The seller,
however, required the buyer to make an additional non-refundable
deposit of $100,000.  <u>Id.</u> at 472-73.

The deadline was further extended, but the buyer still
failed to close.  <u>Id.</u> at 473.  The seller retained both the
$25,000 initial deposit and the $100,000 additional deposit as
liquidated damages.  <u>Id.</u>  The buyer sued to recover the $100,000
additional deposit, but the trial court awarded summary judgment
to the seller.  <u>Id.</u>

On appeal, the New Hampshire Supreme Court observed that the
purchase and sale agreement envisioned the possibility of
additional deposits which would be non-refundable.  <u>Id.</u> at 477.
The court also noted that "the liquidated damages provision did
not differentiate between the original deposit and any additional
deposits paid after the execution of the contract."  <u>Id.</u>  The
court concluded that the reasonable interpretation of the
contract was that "all deposits paid towards the purchase price
would be forfeited in the event that the plaintiff failed to
fulfill its obligations under the contract."  <u>Id.</u>

The Agreement in this case contains provisions that are
substantially similar to the contract in <u>C&M Realty Trust</u>, and
just as the provisions at issue in <u>C&M Realty</u> were complementary,
so too are paragraphs 3, 14, and 17.  Paragraph 3 initially

20

describes the deposit; paragraph 14 explains that the deposit
may, at the Estate's option, serve as liquidated damages; and
paragraph 17 further emphasizes paragraph 14 by explaining that
the deposit becomes non-refundable upon the occurrence of the
stated conditions.

Paragraph 17 is not ambiguous, as Hughes argues.  Rather, it
clearly explains that the deposit, which was supposed to have
been placed in escrow, was to become the property of the seller
if the seller accepted all the terms and conditions of the sale.
Paragraph 14, however, remained operative, and therefore the
deposit could have served as liquidated damages, but only if the
Estate elected this option.

b.   Election of Remedy

The remaining issue to resolve is whether, as provided in
paragraph 14, the Estate opted to treat the deposit as liquidated
damages.  Hughes contends that this matter is genuinely disputed,
and argues that the court should apply Orr v. Goodwin, 157 N.H.
511 (2008).

In Orr, the parties entered into a sales agreement that
required a $10,000 deposit and a liquidated damages clause that
allowed the seller, in the event of a breach by the buyer, to opt
to retain the deposit as liquidated damages.  157 N.H. at 513.

Several months later, the parties executed an addendum that
required an additional deposit of $15,000.  Id.  The buyers did
not close at the appointed time in October, 2005, and the sellers
kept the $25,000.  The parties were not in contact until early
2007, when the sellers sued to recover damages.  Id.  Although
the sellers argued that it was "not their intention or belief
that their damages would be limited to the $25,000.00 deposit,"
the court held that they were barred from seeking additional
damages because they had, in fact, opted to retain the deposit as
liquidated damages.  Id. at 514.  The court noted that the
sellers had "retained the deposit, without communication to the
defendants, for nearly a year and a half before instituting
[their] suit."  Id. at 519.

In this case, by contrast, the Estate had a right to the
$25,000 deposit on or before March 15, 2007, before the breach
occurred.  Therefore, the Estate's decision to keep the deposit
did not show that the Estate had chosen to treat the deposit as
liquidated damages, but rather that it was taking possession of
the deposit because the provisions in paragraph 17 had been
fulfilled.  Moreover, the Estate's attorney told Hughes's
attorney, in an April 14, 2008, email that, "Seller is choosing
not to exercise th[e] option [discussed in paragraph 14]."  Pl.'s
Memo., Barney Decl., Exh. A at 1.  This notification was made

22

following weeks of discussions aimed at reviving the transaction, not after a year and a half of silence, as in <u>Orr</u>.  There is no evidence that the Estate or Avery chose to accept the deposit as liquidated damages, and it is not an issue of disputed fact that precludes summary judgment.[4]  In pursuing damages for Hughes's breach of the Agreement, Avery is not limited to the $25,000 deposit.

### Conclusion

For the foregoing reasons, Avery's motion for partial summary judgment (doc. no. 29) is granted.  Hughes is liable to Avery for his breach of the Lease, and owes damages for rent, late charges, and utilities, less his security deposit, in the amount of $18,918.50.  Hughes is also liable to Avery for his breach of the Agreement, and Avery's damages for the breach are not limited to the $25,000 deposit paid by Hughes.

---

[4]Hughes's argument that Avery is limited to the deposit because he intended this and thought she did too is unavailing. As discussed above, a court interpreting a contract's meaning looks to the language of the contract.  Even if the contract is ambiguous, which this is not, the court uses an objective standard to determine the parties' intent.  <u>In re Taber-McCarthy</u>, 160 N.H. at 115.  Hughes's evidence about what he subjectively intended is irrelevant.  For the same reason, his evidence about why the deposit was non-refundable, rather than placed in escrow, is also irrelevant.

The following issues remain for trial:  the additional amounts, if any, for which Hughes is liable due to his breach of the Lease; and the amount for which Hughes is liable due to his breach of the Agreement.  The parties would be well advised at this point to undertake good faith negotiations or mediation in order to resolve this matter.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

August 11, 2010

cc:  Laurie R. Bishop, Esquire
     Timothy a. Gudas, Esquire
     William C. Saturley, Esquire